1  CHARLES L. THOMPSON IV (State Bar No. 139927)
   Email: thompson@kmm.com
2  CORINN JACKSON (State Bar No. 239275)
   Email: jackson@kmm.com
3  KAUFF MCCLAIN & MCGUIRE LLP
   One Post Street, Suite 2600
4  San Francisco, California 94104
   Telephone:  (415) 421-3111
5  Facsimile:   (415) 421-0938

6  Attorneys for Plaintiff
   DC RISK SOLUTIONS, INC.
7

8              UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10

11 | DC RISK SOLUTIONS, INC.,          | CASE NO. C08-02948 SI
12 |              Plaintiff,           | DECLARATION OF CHARLES THOMPSON IN SUPPORT OF
13 | v.                                | PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING
14 | NANCY FROST, an individual, and DOES 1 | ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY
15 | through 100, inclusive,            | INJUNCTION
16 |              Defendant.           | DATE:
17 |                                   | TIME:
                                         DEPT:    10; 19th Floor
                                         JUDGE:   Hon. Susan Illston
18
                                         COMPLAINT FILED:  June 12, 2008
19                                       TRIAL DATE:       No Date Set

20

21

22

23

24

25

26

27

28

KAUFF MCCLAIN & MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE (415) 421-3111

DECLARATION OF CHARLES THOMPSON ISO PLAINTIFF'S
MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER
TO SHOW CAUSE RE PRELIMINARY INJUNCTION

CASE NO. C08-02948 SI.

I, CHARLES L. THOMPSON IV, hereby declare and state:

1. I am a partner in the law firm of Kauff, McClain & McGuire, counsel of record for Plaintiff DC Risk Solutions, Inc. I have personal knowledge of the facts stated herein and, if called as a witness, could and would competently testify thereto.

2. On February 25, 2008, DC Risk filed a Complaint for Damages and Injunctive Relief in Superior Court of California, County of San Francisco (Case No. CGC 08-472555). DC Risk alleged breach of contract, tortuous interference with contractual relations, breach of fiduciary duty, trade secret misappropriation, and conversion. On February 28, 2008, DC Risk sought a temporary restraining order in state court on the basis of trade secret misappropriation. DC Risk did not have in its possession at that time the letters of solicitation sent by Frost. Instead, Frost in her declaration attested that she only had "announced" her resignation to DC Risk clients. DC Risk also had not conducted a forensic investigation of her company-issued laptop. The court declined to issue the restraining order on the basis that it was too broad; the court, however, informed the parties that it would consider a more narrowly drawn order. A true and correct copy of the declaration that Frost submitted in support of her opposition is attached hereto as **Exhibit A.**

3. On June 23, 2008, via e-correspondence, I notified Gregory de la Pena that Plaintiff would be moving ex parte for injunctive relief based on Nancy Frost's misappropriation of confidential and trade secret information. Mr. de la Pena is an attorney with the law firm of de la Pena & McDonald, counsel of record for Ms. Frost in the matter that DC Risk filed against her in state court. I informed Mr. de la Pena that it was my understanding that the court would set a hearing date and that the court's date for hearing Civil Law and Motions was on Fridays at 9:00 a.m. A true and correct copy

\\
\\
\\

- 1 -

DECLARATION OF CHARLES THOMPSON ISO PLAINTIFF'S
MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER
TO SHOW CAUSE RE PRELIMINARY INJUNCTION

CASE NO. C08-02948 SI

of my e-correspondence to Mr. de la Pena is attached hereto as **Exhibit B.**

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed this 24th day of June, 2008 at San Francisco, California.

                                                                      /s/
                                      CHARLES L. THOMPSON

4826-8559-6930.1

KAUFF MCCLAIN & MCGUIRE LLP
ONE POST STREET
SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE (415) 421-3111

DECLARATION OF CHARLES THOMPSON ISO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

CASE NO. C08-02948 SI

# EXHIBIT A

Gregory R. de la Peña (SBN 126626)
DE LA PEÑA & McDONALD LLP
785 Market Street, 14th Floor
San Francisco, CA 94103
Telephone: (415) 227-4100
Facsimile: (415) 227-4116

Attorney for Defendant
NANCY FROST

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO

BY FACSIMILE

| | |
|---|---|
| DC RISK SOLUTIONS, INC., <br><br> Plaintiff, <br><br> v. <br><br> NANCY FROST, an individual, and DOES 1 through 100, inclusive, <br><br> Defendants. | CASE NO.: CGC 08-472555 <br><br> DECLARATION OF NANCY FROST IN OPPOSITION TO DC RISK SOLUTION, INC.'S APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION <br><br> DATE: February 28, 2008 <br> TIME: 11:00 a.m. <br> DEPT: 301 |

I, NANCY FROST, declare as follows:

1. I have personal knowledge of each fact stated in this declaration, except those facts that are stated upon information and belief, and if called as a witness, I could and would testify competently thereto.

2. I began working for USI, a national insurance broker, in June of 2003.

3. At that time, I met Wesley Justyn through a mutual friend that was working for Summit Global Partners (Summit), another insurance broker. My friend and Mr. Justyn both worked for Summit.

4. At that time, my friend introduced me to Mr. Justyn. Mr. Justyn had existing clients that needed assistance procuring employee benefit insurance. Employee benefit insurance has been my specialty since 1987.

12534

- 1 -

DECLARATION OF NANCY FROST IN OPPOSITION TO DC RISK SOLUTION, INC.'S APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

5. As a result of these discussions, Mr. Justyn and I entered into a "sub-broker agreement" in which I arranged for employee benefit insurance for Mr. Justyn's clients through his company.

6. This business relationship lasted for approximately 10 months, until I came to the conclusion that there would be more business opportunities for both Mr. Justyn and myself if we worked together at the same insurance broker.

7. Consequently, I left USI and began working with Mr. Justyn at Summit in approximately April 2004.

8. During the time I worked with Mr. Justyn, I worked as part of the Health Care team. My part of this team was employee benefits. Mr. Justyn handled Medical Malpractice, Provider Excess Liability Insurance and Worker's Compensation. Other insurance needs were handled by other members of the team.

9. At Summit, the Health Care Team worked as a true team, sharing clients. Mr. Justyn and I worked together particularly closely. We all worked on the team's clients together. Mr. Justyn and I developed a close and trusting working relationship.

10. In approximately September or October of 2004, Summit issued an announcement that USI was conducting a due diligence investigation toward purchasing Summit. In approximately January 2005, presumably after the investigation was completed, Summit announced that USI had decided to purchase Summit and it was going to consolidate offices.

11. Having earlier worked for USI, I did not want to again work for them. I expressed this concern to Mr. Justyn and my desire to leave USI. Mr. Justyn told me he understood my concerns.

12. In this discussion, Mr. Justyn said he would like to introduce me to someone who ran an insurance brokerage. The owner was Shawn Evans of DC Risk Solutions, Inc. ("DC Risk"). Mr. Justyn told me that Mr. Evans lived in France and ran his business out of France. However, Mr. Evans had client relationships in Northern California. Mr. Justyn also told me that Mr. Evans did not have a license to sell insurance in California.

12534

- 2 -

DECLARATION OF NANCY FROST IN OPPOSITION TO DC RISK SOLUTION, INC.'S APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

13. Mr. Justyn suggested that working for Mr. Evans might be a good fit for me. Mr. Justyn stated that I could continue to work with him on our mutual clients while in the employ of DC Risk. Mr. Justyn further stated to me that if the Health Care Team moved to another brokerage, that I could possibly come back and work with him.

14. Mr. Justyn told me that DC Risk did not have any employee benefit clients, only medical malpractice.

15. Shortly after, I met with Mr. Evans to discuss the possibility of my employment with DC Risk. I believe Mr. Evans may have spoken with Mr. Justyn about me. I called Mr. Evans, who told me he was expecting my call. We discussed my working for DC Risk. During these discussions, Mr. Evans specifically told me that I could "house" _my_ existing business and _my_ existing clients with DC Risk using their infrastructure to support them. He also stated that we could work together on new clients. He went further and stated that if I decided to go back and work with Mr. Justyn at a later date, he would understand and support my decision.

16. Based upon my discussions with Mr. Evans and the representations he made, I accepted employment and started working for DC Risk in approximately June 2005.

17. When I began working for DC Risk and consistent with what Mr. Justyn had previously told me, Mr. Evans personally told me that DC Risk had no employee benefits insurance business other than the business I brought to the company. In fact, Mr. Evans stated that they did not have anyone at DC Risk that was licensed to do Employee Benefit insurance.

18. Also, when I began working with DC Risk, they were not licensed to sell insurance in California. I actually filled out license applications and obtained the California license to sell insurance. I had to pay the application fees and Mr. Evans reimbursed me.

19. During my employ with DC Risk, I continued to work with Mr. Justyn, sharing clients and other potential business opportunities. I regularly discussed this with Mr. Evans, informing him of our mutual marketing and business efforts. Mr. Evans always supported these efforts. He appeared excited at the prospect of these potential shared business opportunities and told me many, many times that he supported me jointly working with Mr. Justyn.

12534
- 3 -
DECLARATION OF NANCY FROST IN OPPOSITION TO DC RISK SOLUTION, INC.'S APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

20. In the end of 2005, I learned that Mr. Justyn moved from USI to work for Lawson Hawks.

21. During the time Mr. Justyn worked with Lawson Hawks, I continued to work with Mr. Justyn, sharing clients and business opportunities, in exactly the same way I did when he worked for USI.

22. Also, during the time Mr. Justyn worked with Lawson Hawks, I continued to regularly provide updates to Mr. Evans as to Mr. Justyn and my mutual marketing and business efforts. Just as before, Mr. Evans always supported these efforts. He appeared excited at the prospect of these potential business opportunities and reiterated that he supported me jointly working with Mr. Justyn.

23. Through our mutual efforts, in June 2006 Mr. Justyn introduced me to Eskaton, a large senior living and services company. Mr. Justyn was on the board of directors of this company. Mr. Justyn told me that as a board member, he was asked to recommend two brokers to make proposals on employee benefit insurance. He recommended Lawson Hawks and me.

24. After both Lawson Hawks and I made presentations on our proposal, Eskaton choose to procure their employee benefit insurance through me and DC Risk.

25. In late 2006, I began to realize that DC Risk did not have the resources to service my large clients and as a result I requested additional help.

26. For example, in January, I had to begin arranging for actuarial review service, had respond to HIPPA questions to ensure HIPPA compliance, be able to respond to COBRA issues and questions, be able to develop and produce employee communications strategy, data analysis analyze claim data, etc. At DC Risk, I was the day to day account manager who had to personally handle these and other items. That did not provide me with time that I wanted to develop new and different business.

27. At some point I learned that DC Risk began negotiations to purchase Mr. Justyn's business. I was excited at the prospect of again working with Mr. Justyn.

28. Later, I learned that a dispute arose between Lawson Hawks and DC Risk. As a

1  result of this dispute, Mr. Justyn was not going to work at DC Risk.

2  29.  Toward the end of 2007, I became concerned about my compensation. In early 2008, I expressed my concerns to Mr. Evans. In these communications, we had disagreements as to my compensation. These disagreements continued into January 2008 and I received emails from Mr. Evans of the tone and tenor from such that I felt that I was in a hostile environment. Because of this and other things, I decided to leave DC Risk.

30.  Shortly after Mr. Justyn began working for Lawson Hawks, Mr. Justyn contacted me to express his opinion that Lawson Hawks would like to have me work for them in their employee benefit department. Thus, when I made my decision to leave DC Risk, I contacted Mr. Justyn about joining Lawson Hawks. Lawson Hawks eventually gave me an offer of employment and I accepted.

## EMAIL

31.  I used the DC Risk email for DC Risk business.

32.  As a routine custom, I regularly cleaned up and deleted emails on my laptop computer.

33.  While working for DC Risk, any emails that needed to be saved were either forwarded or carbon copied to either Judith Evans and/or Sue Sample. Mr. Evans and Judith Evans told me that I was to do this. They told me that they keep and post all such communications on the company intranet. The DC Risk company intranet is a web-based program/resource for all employees to archive client and company information. Thus, each time I forwarded or carbon copied them on each such email, I would delete it from my computer as I knew that DC Risk had an archived copy.

34.  On a quarterly basis, Ms. Sample would come to my home to service my company laptop. She would back up the data on the computer, copying email and other documents. Each time, she would hook a UBS hard drive and copy important data to it. I understood and believed that she then took the data and the hard drive and loaded important information onto the company computer system, including the company intranet.

12534                                      - 5 -
DECLARATION OF NANCY FROST IN OPPOSITION TO DC RISK SOLUTION, INC.'S APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

35. On one particular occasion in either November or December 2007, Ms. Sample came to my home to service my computer. After copying data, she discussed alternative ways for me to be more efficient and organized with data on my computer. She suggested creating folders for each current and prospective client in my email program. In fact, she set up each such folder on my laptop. However, I never used these folders. They were empty when there were created and remained empty until the day I turned in my laptop to DC Risk.

36. To the best of my recollection, there may have been a couple old folders that may have had old emails. However, I did not use the folder scheme set up by Mr. Sample.

37. During my employment at DC Risk, I also met with Judith Evans every Monday to give documents to her that were not emailed to her or Ms. Sample. Once these documents were given to her, I would routinely delete them from my computer. If there were written documents, I would shred them.

38. In preparation for leaving DC Risk, I did delete personal emails, such as from family and personal friends, from my computer.

### DC RISK FILES

39. Thirty days before I ended employment, I delivered DC Risks files to Mr. Evans so that they could be archived.

40. On February 18, 2008, I emailed formal notice that I was leaving DC Risk.

41. On that same day, I Federal Expressed my laptop, printer, telephone, credit card, computer accessories, and other miscellaneous equipment. At that time, I believed that this shipment sent all DC Risk property to them. I did not believe I had any DC Risk Files.

42. On February 21, 2008, I received a letter from DC Risk asking, amongst other things, that all files be returned. This letter caused me to rethink whether I had any more DC Risk Files that had not been returned. On February 23, 2008, I thought that I should check some boxes in my garage to make absolutely certain. In my search, I did find some selected old DC Risk files mixed in with my personal files. I put these files in a box for shipment and I did not look at them. However, I remember that the last time I may have looked at these documents may have been one

DECLARATION OF NANCY FROST IN OPPOSITION TO DC RISK SOLUTION, INC.'S APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

year ago. These were not active files that I was working on. I have Federal Expressed these files to DC Risk.

### MCHENRY MEDICAL GROUP

43. On February 18, 2007, I Federal Expressed a letter to McHenry Medical Group providing an announcement that I was leaving DC Risk and joining Lawson Hawks.

44. I did not enclose a "broker of record" form with this letter.

45. I have never prepared a broker of record form for McHenry Medical Group, nor do I presently intend to do so.

46. Other than this one letter, I have not contacted anyone with McHenry Medical Group, nor do I have any current plans to do so.

47. The only documents or emails relating to McHenry Medical Group that I may have had were either sent or given to Judith Evans and/or Sue Sample per the above routine. As soon as I sent or gave these emails and documents to them, I would delete and/or shred the originals as I knew DC had an archived copy. Hence, I do not have nor did I maintain a client file for McHenry Medical Group.

### SUTTER COAST HOSPITAL

48. On February 18, 2008, I Federal Expressed a letter to letter to Jim Strong at Sutter Coast Hospital announcing that I was leaving DC Risk to work for Lawson Hawks.

49. On February 19, 2008, Mr. Strong emailed me saying he had the letter. Shortly thereafter, he telephoned me. Mr. Strong told me that he wanted to continue to work with me at Lawson Hawks. He asked me what was the proper way to do this, as he wanted to do this, "the right way." I let him know that the way to do this was to sign a change of broker letter.

### ESKATON

50. I understand and believe that Eskaton has been a long term client of Mr. Justyn.

51. On February 19, 2008, I called Terrie Beck, the Director of Compensation and benefits with Eskaton. I confirmed that she had received my letter. Ms. Beck expressed concern that she would not be working with me any longer given my change of employment. I told Ms.

Beck to speak with Todd Murch, the CEO of Eskaton as he may have had a conversation with Mr. Justyn. I did not say anything else to Ms. Beck.

52. Later that day, Ms. Beck called and informed me that Mr. Murch had directed her to move the employee benefit insurance to Lawson Hawks. Ms. Beck told me that Mr. Murch instructed her to work with me on preparing the appropriate paperwork.

### COMMUNITY HOSPITAL

53. On February 18, 2008, I Federal Expressed a letter to Community Hospital personnel announcing that I was leaving DC Risk to work for Lawson Hawks.

54. Other than this one letter, I have not contacted anyone with Community Hospital nor do I have any current plans to do so.

### UNAUTHORIZED USE OF MY PRIVATE EMAIL

55. I have a private email that is not used for DC Risk business. My private email address is nlfrost4@gmail.com.

56. At no time did I ever authorize anyone from DC Risk to access my personal email.

57. I understand that DC Risk did access my personal email account and reviewed emails in this account. I feel that unauthorized access and inspection is an invasion of my privacy.

### MISCELLANEOUS

58. Housework: I did receive an email from Mr. Hilgers on February 6, 2008 on my personal email. Mr. Hilgers sent me an offer of employment and referenced stated, "I assume you are doing housework consistent with our conversation yesterday." The day before, I had a conversation with Mr. Hilgers where I did tell him I was behind in my housework. What I meant is that I had to cleanup my home. Hence, I believe Mr. Hilgers was being humorous in referencing my cleaning activities.

59. At no time have I ever told or otherwise communicated to anyone at Lawson Hawks information about commission rates, loss runs, loss history, etc. I did not personally keep this information either on my computer or in written files, as DC Risk had this information either in its intranet or computer system.

1  I declare under penalty of perjury under the laws of the State of California that the foregoing
2  is true and correct.
3  Executed on February 28, 2008 at Mountain View, California.

_____
NANCY FROST

DE LA PEÑA & MCDONALD LLP
785 Market street, 14th floor
San Francisco, CA 94103
Tel. (415) 227-4100 Fax (415) 227-4116

12534

- 9 -

DECLARATION OF NANCY FROST IN OPPOSITION TO DC RISK SOLUTION, INC.'S APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

# EXHIBIT B

**Thompson, Charles L.**

| | |
|---|---|
| From: | Thompson, Charles L. |
| Sent: | Monday, June 23, 2008 3:37 PM |
| To: | Gregory de la Pena |
| Cc: | Thompson, Charles L. |
| Subject: | DC Risk v. Nancy Frost |

Mr. de la Pena:

DC Risk has filed a complaint against Nancy Frost in federal court. It is DC Risk's understanding that Ms. Frost has been served with a copy of the complaint. DC Risk also will be fiing tomorrow an ex parte application for injunctive relief. It is DC Risk's understanding that Judge Ilston will notify the parties as to the hearing date. The Court's regular Civil Law and Motion calendar falls on Fridays at 9:00 a.m. The Court is located in Courtroom 10 on the 19th Floor.

Please let us know whether your firm is representing Ms. Frost in this matter. If so, we will provide your office with a courtesy copy of the documents.

Charles Thompson
Kauff McClain & McGuire
One Post Street
26th Floor
SF CA 94104
415.421.3111