**TABLE OF CONTENTS**

Page

I. INTRODUCTION ................................................................................................ 1

II. STATEMENT OF FACTS .................................................................................. 3

    1. History ......................................................................................................... 3

    2. Response to DC RISK Claims .................................................................... 5

        a. Claim 1: "On February 18, 2008, Frost Misappropriated Company Property" ............................................................................................ 5

        b. Claim 2: "On February 18, 2008, Frost Diverted Company Property" .... 7

        c. Claim 3: "On February 18, 2008, Frost Used DC RISK Information to Solicit DC RISK Clients" ............................................................................ 7

        d. Claim 4: "On February 19, 2008, DC RISK Learned That Frost Had Deleted Client Information and Taken Client Files" .................................. 8

        e. Claim 5: "Frost Successfully Solicited DC RISK Clients Using DC RISK Confidential Information" ...................................................................... 8

III. LEGAL ARGUMENT .......................................................................................... 9

    A. DC RISK Is Not Entitled To Injunctive Relief ............................................... 9

        1. Standard for Granting Injunctive Relief ................................................ 9

        2. DC RISK Cannot Meet The Conditions Or Requirements For Injunctive Relief ..................................................................................................... 10

            a. There Is No Imminent Threat of Injury ............................................ 11

            b. There Is No Evidence To Support The Claim That Monetary Damages Are Inadequate ............................................................................... 11

            c. The Damages DC RISK Seeks Are Speculative .................................. 11

        3. There Is No Clear Showing of DC RISK's Likelihood Of Success ........ 12

            a. Ms. Frost Did Not Improperly Solicit Clients ..................................... 12

            b. DC RISK Has Failed to Establish Its "Ownership" of The Subject Clients ............................................................................................. 13

DE LA PEÑA & MCDONALD LLP
785 Market Street, 14th Floor
San Francisco, CA 94103
Tel. (415) 227-4100 Fax. (415) 227-4116

        c. DC RISK Has Failed to Establish That Information Ms. Frost Allegedly Accessed Is Protected.................................................. 13

    4. DC RISK's Injunctive Relief Request is Grossly Overbroad And Unenforceable........................................................................ 14

    5. DC RISK's Second Lawsuit Against Ms. Frost Is Pretextual................ 15

IV. CONCLUSION............................................................................ 15

# TABLE OF AUTHORITIES

| CASES | PAGE |
|---|---|
| Abrams v. St. Johns Hospital (1994) 25 Cal.App.4th 628, 636 | 10 |
| Aetna Bldg. Maint. Co. v. West (1952) 39 Cal.2d 198, 204 | 12 |
| American Credit Indem. Co. v. Sacks (1989) 213 Cal.App.3d 622, 635-636 | 12 |
| Amoco Production Co. v. Vill. of Gambell, Alaska (1987) 480 U.S. 531, 542 | 10 |
| Carribean Marine Serv. Co., Inc. v. Baldridge (9th Cir 1988) 844 Fed.2d 668, 674 | 10 |
| Common Cause v. Board of Supervisors (1989) 49 Cal.3d 432, 441-442 | 10 |
| Fleishman v. Superior Court (2002) 102 Cal.App.4th 350, 356 | 10 |
| Goldie Bookstore, Inc. v. Sup. Ct. (9th Cir. 1984) 739 Fed.2d 466, 472 | 10 |
| Hilb, Rogal & Hamilton Ins. Services of Orange County, Inc. v. Robb (1995) 33 Cal.App.4th 1812, 1821-1822 | 12 |
| Intel Corp. v. USLI Systems Technology, Inc. (Fed. Cir. 1993) 995 Fed.2d 1566 | 2 |
| Madrid v. Perot Systems Corp. (2005) 130 Cal.App.4th | 10 |
| Mazurek v. Armstrong (1997) 520 U.S. 968, 972 | 10 |
| People v. Toomey (1984) 157 Cal.App.3d 1, 20 | 10 |
| Readylink Healthcare v. Cotton (2005) 126 Cal.App.4th 1006, 1015 | 12 |
| Robert L. Cloud & Assoc., Inc. v. Mikesell (1999) 69 Cal.App.4th 1141, 1150 | 12 |
| Sierra On-Line, Inc. v. Phoenix Software, Inc. (9th Cir. 1984) 739 Fed.2d 1415 | 9 |
| Weinberger v. Romero-Barcelo (1982) 456 U.S. 305, 312 | 10 |

Gregory R. de la Peña (SBN 126626)
Keith L. Cooper (SBN 175741)
DE LA PEÑA & MCDONALD LLP
785 Market Street, 14th Floor
San Francisco, CA 94103
Telephone: (415) 227-4100
Facsimile: (415) 227-4116
gdelapena@dlpmcd.com
kcooper@dlpmcd.com

Attorney for Defendant
NANCY FROST

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DC RISK SOLUTIONS, INC., <br><br>  Plaintiff, <br><br> v. <br><br> NANCY FROST, an individual, and DOES 1 through 100, inclusive, <br><br>  Defendant. | CASE NO.: C 08-02948 SI <br><br> **NANCY FROST'S OPPOSITION TO DC RISK SOLUTIONS, INC.'S APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION** |

Defendant NANCY FROST ("Ms. Frost") hereby submits the following Opposition to Plaintiff DC RISK Solutions, Inc.'s Application for Temporary Restraining Order and Order to Show Cause re Preliminary Injunction.

## I. INTRODUCTION

In a case of blatant forum shopping, following the earlier denial of its request for a temporary restraining order and preliminary injunction in its now-voluntarily dismissed and essentially identical lawsuit in San Francisco Superior Court,[1] plaintiff DC Risk Solutions,

---

[1] *DC RISK v. Nancy Frost,* San Francisco Superior Court Civil No. CGC 08-472555

- 1 -

Inc. ("DC RISK") seeks to protect information that is in no respect proprietary, and complains about the loss of "clients" who have elected to follow Ms. Frost to a new insurance broker not because Ms. Frost enticed them through improper solicitation but rather because she brought them to DC RISK in the first place and they predictably chose to follow her to her next employment or, in a single instance, Ms. Frost had gained the client's favor through her competent management of its account. As significantly, DC RISK offers this Court no evidence whatsoever that it is in danger of immediate and irreparable harm – the necessary predicate for the issuance of such a "drastic and extraordinary remedy." *Intel Corp. v. USLI Systems Technology, Inc.* (Fed. Cir. 1993) 995 Fed.2d 1566, at 1568. In fact, DC RISK's claim of potential future damages now five months after Ms. Frost resigned are entirely speculative.

Ms. Frost left DC RISK this last February. DC RISK's second lawsuit and second application for TRO and preliminary injunction, filed nearly five months later, complains of the loss of only three former clients and about Ms. Frost's access to outdated, insignificant, non-proprietary and essentially immaterial information. Significantly, DC RISK has not and cannot establish that anything Ms. Frost has allegedly taken with her or to which she had access has caused DC RISK damage. The one document that Ms. Frost is alleged to have downloaded, a wellness proposal prepared by Sutter Health Partners ("Sutter Health") for Ms. Frost-secured client Eskaton, was not DC RISK's trade secret information, and, by DC RISK's own admission, was provided to DC RISK by Sutter Health upon request one day after Ms. Frost resigned. Indeed, DC RISK's principal damages appear to be the costs it voluntarily incurred in unsuccessful efforts to establish that Ms. Frost did something wrong. (DC RISK offers the declaration of Bryan Door, the individual who attempted to retrieve allegedly deleted information from Ms. Frost's email address, but was apparently unable to do so.)

Apart from the paucity of evidentiary basis for the pending application, the legal basis upon which DC RISK claims entitlement to proceed in Federal Court, having voluntarily scuttled its earlier state court suit based on essentially identical facts, is itself a thin thread. DC RISK claims, on the basis of innocuous "evidence," much of it pure conjecture and all of it contested and/or

inadmissible, that Ms. Frost violated the Computer Fraud Abuse & Protection Act, 18 U.S.C. § 1030 *et seq.* by allegedly removing, copying and destroying data. [MPA In Support of Application For TRO and OSC Re Preliminary re Preliminary Injunction ("DC RISK MPA"), p. 6:25-26.] Absent that flimsy and manufactured claim, there would be no predicate for federal jurisdiction.

This application for TRO, as the San Francisco Superior Court ruled in the application before it, should be denied precisely because there is no evidence that there is a significant threat of irreparable damage to DC RISK, no evidence that the alleged threat is "imminent," and no evidence to support DC RISK's burden of establishing a likelihood it will ultimately prevail in this action by a clear showing.

## II. FACTUAL SUMMARY

### 1. History

Ms. Frost has worked in the insurance field since 1986 and has specialized in employee benefit insurance since 1987. (Declaration of Nancy Frost ("Frost Dec."), paragraph ("¶") 2.) Ms. Frost met Wesley Justyn, an individual with another employer insurance specialty in 2003, and began working with Mr. Justyn and his Health Care Team in or around April 2004. (Frost Dec ¶¶ 3-9; Declaration of Wesley Justyn ("Justyn Dec.") ¶¶ 2, 3) The Health Care Team worked as a true team, sharing current and prospective clients. Justyn and Ms. Frost worked together particularly closely and developed a close and trusting working relationship. (*Id.*) In approximately January 2005, Summit announced that a company called USI had decided to purchase Summit and would consolidate offices. (Frost Dec. ¶ 10; Justyn Dec. ¶ 4.)

Having earlier worked for USI, Ms. Frost did not want to again work for it and expressed her concern to Justyn. (Frost Dec. ¶ 10; Justyn Dec. ¶ 5.) In discussion with him, Justyn stated that he wanted to introduce Ms. Frost to someone who ran an insurance brokerage – namely, Shawn Evans (hereinafter "Evans"), the owner of DC RISK. Justyn told Ms. Frost that Evans lived in France and ran his business out of France, but that he had client relationships in Northern California. Justyn also told Ms. Frost that Evans did not have a license to sell insurance in California. (Frost Dec. ¶ 11; Justyn Dec. ¶ 6.)

12519

- 3 -

Justyn suggested that working for Evans might be a good fit for Ms. Frost and further that Ms. Frost could continue to work with Justyn on their mutual clients while in the employ of DC RISK. Justyn also stated that if the Health Care Team moved to another broker, that Ms. Frost could possibly come back and work with him. During those conversations, Ms. Frost also was told that DC RISK had few or no employee benefit clients, only medical malpractice. (Frost Dec. ¶ 11.)

Shortly after these conversations with Justyn, Ms. Frost met with Evans of DC RISK. Ms. Frost and Evans discussed her working for DC RISK, and Evans specifically represented to Ms. Frost that she "house" her existing business and her existing clients with DC RISK using their infrastructure to support them. Evans also stated that she and DC RISK could work together on new clients. He went further and stated that if Ms. Frost decided to go back and work with Justyn at a later date, he would understand and support such a decision. Based upon Ms. Frost's discussions with Evans and the representations he made, she accepted employment and started working for DC RISK in approximately June 2005. (Frost Dec. ¶¶ 12, 13.)

When Ms. Frost commenced working for DC RISK and consistent with what Justyn had previously told her, Evans personally told Ms. Frost that DC RISK had no employee benefits insurance business other than the business Ms. Frost brought to the company. In fact, Evans stated that they did not have anyone at DC RISK that was licensed to offer Employee Benefit insurance. Since DC RISK was also not licensed to sell insurance in California when Ms. Frost commenced employment, she filled out the license applications and obtained the California license to sell insurance. (Frost Dec. ¶¶ 16, 17.)

While with DC RISK, Ms. Frost continued to work with Justyn, just as before, sharing clients and other potential business opportunities. She regularly discussed this with Evans, informing him of their mutual marketing and business efforts. Evans always supported these efforts and appeared excited at the prospect of these potential shared business opportunities. Evans stated on numerous occasions that he supported Ms. Frost working jointly with Justyn. (Frost Dec. ¶ 18.)

Towards the end of 2005, Ms. Frost learned that Justyn had moved from USI to Lawson Hawks. (Frost Dec. ¶ 19.) In fact, Lawson Hawks had acquired the Pacific Region Healthcare

- 4 -

Group and its book of business from USI. (Justyn Dec. ¶ 9.) After this acquisition and Justyn's move to Lawson Hawks, Ms. Frost continued to work with Justyn, sharing clients and business opportunities in the exactly the same way she had before. Just as before, Ms. Frost continued to regularly provide updates to Evans as to her mutual marketing and business efforts with Justyn. Just as before, Evans was supportive of these mutual efforts. (Frost Dec. ¶ 20.)

In late 2006, Ms. Frost reached the conclusion that DC RISK did not have the resources to service her large clients and as a result she requested additional help. As the day to day account manager at DC RISK, Ms. Frost was responsible for personally handling a great number of duties without assistance which did not allow her the time that that she needed to develop new and different business. (Frost Dec. ¶ 23.) Additionally, toward the end of 2007, Ms. Frost became concerned about her compensation and expressed those concerns to Evans. In these communications, Ms. Frost and Evans had disagreements regarding her compensation and culminated in Ms. Frost's receipt of emails from Evans, the tone and tenor of which led to Ms. Frost feeling she was in a hostile environment. (Frost Dec. ¶ 25.) Ms. Frost then decided to leave DC RISK and seek employment elsewhere and contacted Mr. Justyn about the possibility of joining Lawson Hawks. (Frost Dec. ¶ 26; Justyn Dec. ¶ 16.) Lawson Hawks eventually offered Ms. Frost employment which she accepted, tendering her resignation on February 18, 2008. (Id.)

### 2. Response To DC RISK Claims

The declaration submitted by Ms. Frost in opposition to DC RISK's application includes detailed refutations of assertions contained in the moving papers and specifically in the declarations of Shawn Evans and Beverly Thomas. Ms. Frost's specific denials of those claims will not be repeated in detail here. However, the general contentions upon which this second lawsuit is predicated will be addressed.

#### a) Claim 1: "On February 18, 2008, Frost Misappropriated Company Property"

The single document which DC RISK has identified as having been presumably downloaded by Ms. Frost was a proposal generated by Sutter Health for Eskaton. [Beverly Thomas

Declaration ("Thomas Dec."), ¶ 8.] Ms. Frost specifically states that she has no recollection of downloading the document (Frost Dec. ¶ 42), and DC RISK's evidence that that she did is not competent. The basis for DC RISK's claim is an alleged hearsay voicemail (Thomas Dec. ¶ 8) to Beverly Thomas from Mary Anna Weklar, a declaration from whom DC RISK has failed to offer either to establish Ms. Weklar's employment by Sutter Health Partners or that Ms. Weklar in fact emailed the proposal to Ms. Frost and an unauthenticated copy of the supposed email the source of which remains a mystery.[2]

Apart from the evidentiary deficiencies, the fact is that the proposal generated by Sutter Health Partners for Eskaton was Eskaton's property, not DC RISK's. Eskaton became a client of DC RISK on specific referral from Wes Justyn to Ms. Frost. ("Frost Dec. ¶ 21; Justyn Dec. ¶ 15.) It was a client that Shawn Evans had explicitly permitted Ms. Frost to "house" while at DC RISK (Frost Dec. ¶ 12), and a client the revenue from which would not have been received but for the ongoing relationship between Mr. Justyn and Ms. Frost.

At the time Ms. Frost resigned from DC RISK, she had every expectation that Eskaton would follow her to Lawson Hawks. After all, it was her customer through her relationship with Mr. Justyn, Mr. Justyn was on the Eskaton board of directors (Justyn Dec. ¶ 11), and Mr. Justyn was now employed by Lawson Hawks. (Justyn Dec. ¶ 1.) Mr. Justyn, as a board member at Eskaton, had as much right to the proposal as did DC RISK. Finally, DC RISK was not denied the proposal. According to Beverly Thomas' declaration, Sutter Health sent it to her the day after Ms. Frost resigned. (Thomas Dec., ¶ 8, page 3:3-4.) DC RISK was free to compete for Eskaton's business and could have pitched the proposal to Eskaton. If it did not, it was due to Eskaton's election to move its business to Ms. Frost and Justyn at Lawson Hawks.

//

---

[2] In her declaration supporting this application, Beverly Thomas claims that "(s)ubsequently, DC Risk was able to confirm that Ms. Frost had received the proposal in an email from Sutter Health Partners on February 18, 2008, at 12:11 p.m." (Thomas Dec.,¶ 8, p. 3:4-6) Contrary to the premise of the application that Ms. Frost irretrievably deleted emails and documents, DC RISK apparently has been able to determine what Ms. Frost is claimed to have downloaded and deleted. Yet, it has offered only this unauthenticated email and two more in support of its overreaching claim of violation of the Computer Fraud Abuse & Protection Act.

12519                                - 6 -
NANCY FROST'S OPPOSITION TO DC RISK SOLUTIONS, INC.'S APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

### b) Claim 2: "On February 18, 2008, Frost Diverted Company Property"

DC RISK's claim of "diverted company property" is based on Ms. Frost's request for information relating to the "loss history" for Eskaton under pharmacy coverage provided by Prescription Solutions. (Thomas Dec., ¶ 11 page 4:3-4.) An insured's "loss history" is not the property of the insurance broker, but rather property of the insured, in this case, Eskaton, and of Prescription Solutions, who generated the report. Eskaton had an absolute right to the report, was awaiting the receipt of the report which was scheduled to be provided February 15, 2008, and Ms. Frost, in her capacity of account manager for Eskaton, did nothing more than provide Eskaton access to information to which it was entitled. (Frost Dec., ¶ 47.) DC RISK does not claim that it was somehow denied the information itself because Ms. Frost secured it to pass on to Eskaton.

### c) Claim 3: "On February 18, 2008, Frost Used DC RISK Information To Solicit DC RISK Clients"

DC RISK's claim that Ms. Frost used DC RISK information to solicit DC RISK clients "while still employed by DC RISK" (DC RISK MPA, p. 3:7-8) is unsupported by evidence. As set forth in her declaration, Ms. Frost executed the letters notifying her clients of her change of employers after the resignation was tendered to DC RISK, and the letters were not prepared on DC RISK's laptop or its stationary. (Frost Dec. ¶ 29.) Moreover, the letters were sent on a national holiday and Ms. Frost's final pay period ended on Friday, February 15, 2008. (Frost Dec. ¶ 27.) To the extent DC RISK argues that they were sent while she was still employed by DC RISK because her resignation said it would be effective on February 19, 2008, that distinction hardly merits discussion as there can be no conceivable damage attributed to the time difference here.

Ms. Frost's letters to several of the clients she serviced while at DC RISK do not constitute improper solicitations. Those letters announce her move and the motive for it but in no way disparages, DC RISK. The closing sentence offering "assistance" is a standard closing line and does not convert the balance of the letter into an inappropriate solicitation.

**d) Claim 4: On February 19, 2008, DC RISK Learned That Frost Had Deleted Client Information and Taken Client Files"**

DC RISK has had four full months to garner evidence that Ms. Frost downloaded and used confidential and proprietary emails or deleted emails that were company property. It has not succeeded. All DC RISK contends is that it believes that Ms. Frost deleted emails as a part of an effort to injure it. However, Ms. Frost's sworn declaration sets forth a far more plausible and unchallenged explanation: Deleting emails (as is true elsewhere) was a normal company practice both for Ms. Frost and for other DC RISK employees including the two Ms. Frost has identified as having assisted her in file management, Judith Evans and Sue Sample.[3] (Frost Dec. ¶¶ 40-46.) Moreover, in response to the claim that she "emptied" client folders within her email system, Ms. Frost notes that all but one of those folders were set up by Ms. Sample in December 2007 (Frost Dec. ¶ 46) and never used — a fact that explains why the folders were empty when Ms. Frost returned her laptop.

**e) Claim 5: "Frost Successfully Solicited DC RISK Clients Using DC RISK Confidential Information"**

DC RISK has listed only three companies it claims Ms. Frost improperly solicited: Sutter Coast Hospital, Eskaton, and Palo Verde Hospital. (DC RISK MPA, p. 4:10-5:14.) While it claims that Ms. Frost solicited those clients "Using DC RISK Confidential Information," it fails altogether to identify any "confidential information" Ms. Frost possessed or allegedly used to solicit the business.[4] Moreover, DC RISK altogether fails to acknowledge or address the actual existing relationships between Ms. Frost and the three clients who elected to move their insurance business to Ms. Frost's new employer.

---

[3] Ms. Frost's assertion that she and Ms Thomas' assistants routinely downloaded and deleted documents was set forth in the declaration Ms. Frost submitted in opposition to DC RISK's application for a similar restraining order in the state court action. (Exhibit A to the declaration of Charles Thompson, at ¶¶ 33-37.) If these claims were unsupported, one would suspect that in the intervening four plus months, DC RISK could have contested the claims through declarations from its employees. It has not.

[4] Earlier, DC RISK claims that information regarding Eskaton's "loss history" prepared by Prescription Solutions based on Eskaton's claims is, by some measure, protected DC RISK data. Of course, it is not.

12519

- 8 -

Both Eskaton and Palo Verde Hospital are joint clients of Ms. Frost and Wes Justyn and were clients Shawn Evans had expressly advised Ms. Frost she could "house" at DC RISK and take with her were she to decide to move on. (Frost Dec. ¶¶ 21, 31, and 35; Justyn Dec. ¶¶ 11, 21.) Why Sutter Coast Hospital also elected to follow Ms. Frost to her new employer is hardly a mystery either. Ms. Frost notes that, upon her first visit to Sutter Coast Hospital, a meeting attended by Shawn Evans in order to introduce her to the hospital and its Human Resource Director, Linda Tvetan, Ms. Tvetan expressed her dissatisfaction with the service the hospital had been receiving from DC RISK and it was only as a result of Ms. Frost's efforts over the next several months that the hospital chose to renew with DC RISK in January 2007. (Frost Dec. ¶ 37.)

## III. LEGAL ARGUMENT

### A. DC RISK Is Not Entitled To Injunctive Relief

DC RISK seeks to enjoin Nancy Frost from using DC RISK's confidential and trade secret information and to compel her to provide an accounting of all information allegedly taken, to return all DC RISK information, and to abide by the terms of her employment agreement. (DC RISK MPA, p. 1:8-15.) A review of the facts and the insubstantial and wholly conjectural evidence DC RISK presents, however, altogether fails to support the claim that Ms. Frost has used or is using confidential and trade secret information, has not returned all DC RISK files, or is not otherwise complying with the terms of her past employment agreement with DC RISK. DC RISK's application lacks merit based on the actual facts of this case and the controlling legal authority. Accordingly, the application is insufficient to meet the conditions required for issuance of a temporary restraining order or preliminary injunction and must be denied in its entirety.

#### 1. Standard for Granting Injunctive Relief

While a preliminary injunction functions to preserve the status quo prior to judgment, it is only available to a litigant who can show that it is needed to prevent imminently threatened irreparable harm. *Sierra On-Line, Inc. v. Phoenix Software, Inc.* (9th Cir. 1984) 739 Fed 2d 1415, at 1422. Neither a TRO nor a preliminary injunction is available if the threatened injury is not

imminent (*Carribean Marine Serv. Co., Inc. v. Baldridge* (9th Cir 1988) 844 Fed 2d 668, 674) or damages to compensate for the alleged harm would be adequate. *Weinberger v. Romero-Barcelo*(1982) 456 U.S. 305, 312. Speculative damages, as is the case here, will not support the issuance of a TRO or preliminary injunction. *Goldie Bookstore, Inc. v. Sup. Ct.* (9th Cir. 1984) 739 Fed 2d 466, 472.

Due to the fact that preliminary injunctions are an extraordinary remedy, the moving party must demonstrate entitlement by a "clear showing." *Mazurek v. Armstrong* (1997) 520 U.S. 968, 972; and while the determination whether to grant injunctive relief rests within the sound discretion of the trial judge (*Abrams v. St. Johns Hospital* (1994) 25 Cal.App.4th 628, 636), trial courts are enjoined not to issue the relief as a matter of course or for every violation of the law. *Amoco Production Co. v. Vill. of Gambell, Alaska* (1987) 480 U.S. 531, 542. Generally, in deciding whether to grant injunctive relief, a trial court must evaluate two interrelated factors: (i) the likelihood that the party seeking the injunction will ultimately prevail on the merits of its claim, and (ii) the balance of harm presented, i.e., the comparative consequences of the issuance and nonissuance of the injunction. *Fleishman v. Superior Court* (2002) 102 Cal.App.4th 350, 356, citing *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 441-442.

Injunctive relief cannot be used to enjoin an event which has already transpired; a showing of threatened future harm or continuing violation is required. (*People v. Toomey* (1984) 157 Cal.App.3d 1, 20.) Injunctive relief has no application to wrongs which have been completed, absent a showing that past violations will probably reoccur. (*Id.*) Thus, injunctive relief is improper in the absence of a threat that an unlawful act will occur in the future. (*Madrid v. Perot Systems Corp.* (2005) 130 Cal.App.4th at 440, 464.)

### 2. DC RISK Cannot Meet The Conditions Or Requirements For Injunctive Relief

Even were the allegations of misconduct DC RISK makes in its complaint and moving papers supported by competent evidence, which they are not, DC RISK still cannot make the "clear

- 10 -

showing" of entitlement to extraordinary relief required for the issuance of either a TRO or preliminary injunction.

### a) There Is No Imminent Threat Of Injury

Ms. Frost resigned her employment on February 18, 2008, almost five months ago. Strikingly, the last act of Ms. Frost's of which DC RISK complains occurred on February 19, 2008 when she discussed the change of brokers with Eskaton. DC RISK submits no evidence post February of any conduct by Ms. Frost that threatens DC RISK with immediate injury. Indeed, it offers no evidence to support a concern that Ms. Frost will take any future action that poses a threat. Thus a principal necessary element of any application for the relief sought is wholly missing here.

### b) There Is No Evidence To Support The Claim That Monetary Damages Are Inadequate

DC RISK has identified two species of damages it claims to have incurred by reason of Ms. Frost's alleged torts. The first is a loss of commissions that DC RISK claims it would have received had Eskaton, Sutter Coast Hospital, and Palo Verde Hospital not elected to follow Ms. Frost to her new employer. The second is the cost of efforts it made to prove Ms. Frost did something improper. Those damages are specifically quantified in the moving papers. Apart from those damages, DC RISK has failed to offer any evidence that monetary damages will not compensate assuming it can prove – a highly dubious proposition - that Ms. Frost's earlier conduct was improper.

### c) The Damages DC RISK Seeks Are Speculative

DC RISK claims that Ms. Frost has confidential information that her new employer could use to compete with it. However, the only concrete example of such evidence is a wellness proposal prepared for Eskaton and a loss history of Eskaton's pharmacy experience in 2007. That information is not confidential and there is no evidence that it was used to compete with DC RISK. Instead, the evidence shows that the wellness proposal was available to DC RISK and the loss history was delivered to Eskaton by Ms. Frost in compliance with Eskaton's specific request for it. (Frost Dec. ¶ 47.) All the other arguments concerning what Ms. Frost may know and what Ms.

Frost may do are purely speculative and directly contradicted by the fact that DC RISK has failed to allege or establish any misconduct over the last five months.

### 3. There is No Clear Showing Of DC RISK's Likelihood Of Success

As important as any of the other prerequisites for the extraordinary relief DC RISK seeks by its application, it must make a clear showing of its likelihood of success in the litigation. It has failed to do so. The evidence it offers, all of which is contested by evidence from Ms. Frost and Mr. Justyn, is neither clear nor convincing.

#### a) Ms. Frost Did Not Improperly Solicit Clients

Under California law, a former employee has the right to compete with his or her former employer but not to solicit new business from the former employer's customers. (*Robert L. Cloud & Assoc., Inc.* v. *Mikesell* (1999) 69 Cal.App.4th 1141, 1150; *Readylink Healthcare* v. *Cotton* (2005) 126 Cal.App.4th 1006, 1015.) But, "[m]erely informing customers of one's former employer of a change of employment, without more, is not solicitation. Equity will not enjoin a former employee from receiving business from the customers of his former employer, even though the circumstances be such that he should be prohibited from soliciting such business." (*Aetna Bldg. Maint. Co.* v. *West* (1952) 39 Cal.2d 198, 204.) (Emphasis added.)

A former employee (as well as a current employee) has the right to mail announcements of his or her new employment to the former employer's customers, even if their identities are trade secrets. Merely informing customers of a change of employment simply does not equate to improper solicitation. (*Id.*; )

The facts and holding of *Hilb, Rogal & Hamilton Ins Services of Orange County, Inc.* v. *Robb* (1995) 33 Cal.App.4th 1812, 1821-1822 are dispositive here. In *Hilb*, while still employed, an insurance agent informed his clients of his planned change of employment. Later, he complied with their requests to transfer their accounts to his new employer. "The timing of his job change announcement does not convert otherwise lawful behavior into prohibited solicitation." (*Id.*)

//

DC RISK claims that the letters Ms. Frost sent to her clients were solicitations. The letters are attached to attorney Roger Sleight's declaration for the Court's review. Ms. Frost submits that they are not impermissible solicitations, and did not become so merely because Ms. Frost provided contact information and offered generic assistance. Ms. Frost did not request the recipients to move their business to Lawson Hawks and she did not include anything beyond the letter. Ms. Frost's passive acceptance of business from these clients does not constitute improper solicitation under well-established law.

### b) DC RISK Has Failed To Establish Its "Ownership" of The Subject Clients

Even if DC RISK had been able to establish a solicitation by Ms. Frost of customers, which it clearly has not, the admissible evidence proffered by Ms. Frost demonstrates quite clearly that two of the three clients DC RISK has conclusorily asserted as its own, are in fact long-time clients of Wesley Justyn who were at most shared with DC RISK when Nancy Frost began her employment there. In fact, DC RISK has offered not even a shred of evidence to support its claim that it "owns" these clients. Ms. Frost's declaration further demonstrates that the third client followed her voluntarily after receiving her notification, and that Ms. Frost did not initiate contact with Sutter Coast Hospital but rather was contacted by it. (Frost Dec. ¶¶ 38-39.)

In sum, DC RISK has offered no evidence, testimonial or otherwise, to support its claim of ownership to any of these clients. It hasn't done so because it cannot.

### c) DC RISK Has Failed To Establish That Information Ms. Frost Allegedly Accessed Is Protected.

DC RISK has asserted that the Eskaton pharmacy benefit "loss history" and a Sutter Health Partners' wellness proposal to Eskaton are trade secrets that Ms. Frost wrongfully accessed. According to Civil Code § 3426.1, a trade secret consists of information that 1) derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use, <u>and</u> 2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

12519

- 13 -

NANCY FROST'S OPPOSITION TO DC RISK SOLUTIONS, INC.'S APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

Here, while DC RISK claims, without any evidentiary support, that DC RISK owns Eskaton's loss history, by its own admission, such information is not in fact authored by DC RISK or maintained in secrecy by DC RISK. It is authored by Prescription Solutions for Eskaton who is entitled to it and who specifically requested it from Ms. Frost. Similarly, the Sutter Health Partners' wellness proposal was generated by someone other than DC RISK for someone other than DC RISK – Eskaton.

As to quotations for insurance prepared by insurance companies and then provided to DC RISK, that information clearly cannot be considered a trade secret owned by DC RISK. Such quotations are not prepared by DC RISK or for DC RISK; and there is nothing to prevent any client/customer from shopping around on its own, using its own loss history for better insurance quotes.

Finally, Ms. Frost has attested to the fact that she has not used any such information, whether protected from disclosure or not, and that she has no intention of doing so. As such, DC RISK's claims that its confidential information has been improperly misappropriated or may be so misused in the future by Ms. Frost lack any evidentiary or legal support and should be flatly rejected by this Court.

### 4. DC RISK's Injunctive Relief Request Is Grossly Overbroad And Unenforceable

DC RISK's have asked this Court to 1) enjoin Ms. Frost from using DC RISK's confidential and trade secret information; 2) require that Ms. Frost provide an accounting of all information taken; 3) require that Ms. Frost return all DC RISK information, and 4) require that Ms. Frost abide by the terms and conditions of her employment agreement.

DC RISK's requests are grossly overbroad and are not supported by any appropriate legal authority. As for DC RISK's request that Ms. Frost be enjoined from using confidential and trade secret information, as discussed above, DC RISK has utterly failed to establish that the information it claims as its own is in fact the confidential property of DC RISK. In fact, as demonstrated by the admissible evidence offered by Ms. Frost, the information is clearly not owned by DC RISK and

any claim of confidentiality has not been established. As there is a dispute as to the ownership of this information, it would improper for the Court to grant DC RISK's first request.

As for DC RISK's requests numbers 2 and 3, Ms. Frost has already returned all information to DC RISK and, moreover, DC RISK has failed to establish that Ms. Frost in fact took any information or property belonging to DC RISK. As addressed at length in Ms. Frost's concurrently filed Objections to Evidence, DC RISK has failed to establish any basis for its claim that Ms. Frost took any files or information belong to DC RISK and thus these requests must be denied.

Lastly, as to DC RISK's request that Ms. Frost be required to abide by the terms and conditions of an employment agreement, once again, DC RISK has failed to provide any support of its claim that Ms. Frost has not abided by the terms of her employment.

In sum, none of DC RISK's specific requests for injunctive relief are proper and the application should be denied in its entirety.

### 5. DC RISK's Second Lawsuit Against Ms. Frost Is Pretextual

Preliminary injunctions are granted infrequently in disputes between competitors over customer lists or other traditional forms of unfair competition. The reason is that there is usually no "irreparable injury," and also because most of these cases have meritorious claims on both sides which must be explored fully before injunctive relief can be considered. In the present situation, before Ms. Ms. Frost resigned from DC RISK to join Lawson Hawks, there was pending litigation by Lawson Hawks against DC RISK (and bad blood as a result) arising from an aborted business purchase agreement between the two (Justyn Dec. ¶¶13-14.) Ms. Frost believes that her resignation and decision to join Lawson Hawks – as opposed to another insurance broker – provided the incentive for DC RISK to file suit, first in San Francisco Superior Court, and, when that court declined to issue the relief DC RISK sought, in this Court.

### IV. CONCLUSION

DC RISK has altogether failed to demonstrate by a clear showing that it is entitled to the "drastic and extraordinary relief" it seeks by this application. It has failed to show that Ms. Frost threatens future harm to it, that such threatened harm is imminent, that it has no adequate legal

12519
- 15 -
NANCY FROST'S OPPOSITION TO DC RISK SOLUTIONS, INC.'S APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

remedy for her alleged conduct, and that there is a likelihood that DC RISK will prevail in this action. Accordingly, this application should be denied.

Dated: July 9, 2008

DE LA PEÑA & McDONALD LLP

By: _____
GREGORY R. de la PEÑA
Attorneys for Defendant NANCY FROST

DE LA PEÑA & McDONALD LLP
786 Market Street, 14th Floor
San Francisco, CA 94103
Tel. (415) 227-4100 Fax. (415) 227-4116

12519

- 16 -

NANCY FROST'S OPPOSITION TO DC RISK SOLUTIONS, INC.'S APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION