Gregory R. de la Peña (SBN 126626)
Keith L. Cooper (SBN 175741)
DE LA PEÑA & MCDONALD LLP
785 Market Street, 14th Floor
San Francisco, CA 94103
Telephone: (415) 227-4100
Facsimile: (415) 227-4116
gdelapena@dlpmcd.com
kcooper@dlpmcd.com

Attorney for Defendant
NANCY FROST

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DC RISK SOLUTIONS, INC., <br><br> Plaintiff, <br><br> v. <br><br> NANCY FROST, an individual, and DOES 1 through 100, inclusive, <br><br> Defendant. | CASE NO.: C 08-02948 SI <br><br> **DECLARATION OF NANCY FROST IN OPPOSITION TO DC RISK SOLUTION, INC.'S APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION** |

I, NANCY FROST, declare:

1. I have personal knowledge of each fact stated in this declaration, except those facts that are stated upon information and belief, and if called as a witness, I could and would testify competently thereto.

**EMPLOYMENT AND RELATIONSHIP HISTORY**

2. I have been employed in the insurance sales business since 1986 and have specialized in employee benefit insurance since 1987.

3. I began working for USI, a national insurance broker, in June of 2003. At that time, I met Wesley Justyn through a mutual friend who was working with him at Summit Global Partners

(Summit), another insurance broker. Mr. Justyn is presently employed with my current employer, Lawson-Hawks Insurance Agency ("Lawson-Hawks").

4. At that time, my friend introduced me to Mr. Justyn. Mr. Justyn had existing clients that needed assistance procuring employee benefit insurance. Employee benefit insurance has been my specialty since 1987.

5. As I got to know him, Mr. Justyn and I discussed and agreed to work together as a team, sharing clients and business. My part of the team was to provide employee benefit insurance products and services to Mr. Justyn's clients. To formalize this agreement, Mr. Justyn and I entered into a "sub-broker agreement."

6. This business relationship lasted for approximately 10 months, until I came to the conclusion that there would be more business opportunities for both Mr. Justyn and myself if we worked together at the same insurance broker.

7. Consequently, I left USI to join Summit and Mr. Justyn in approximately April 2004.

8. During the time I worked with Mr. Justyn, I worked as part of the "Health Care Team." My focus within the team was employee benefits insurance. Mr. Justyn handled Medical Malpractice, Provider Excess Liability Insurance and Worker's Compensation. Other insurance needs were handled by other team members.

9. At Summit, the Health Care Team worked as a true team, sharing clients. As a result of team nature of our joint efforts, and the fact that Mr. Justyn. Mr. Justyn and I worked together particularly closely and we all worked on the team's clients together. Mr. Justyn and I developed a close and trusting working relationship.

10. In approximately September or October of 2004, Summit announced that USI, my former employer, was conducting a due diligence investigation in anticipation of the possible acquisition of Summit. In approximately January 2005, presumably after the investigation was completed, Summit announced that USI had decided to purchase Summit and it was going to consolidate offices. Based on my prior experience at USI, I did not want to again work for that company, and I expressed my concerns to Mr. Justyn who acknowledged them.

DE LA PEÑA & McDONALD LLP
785 Market street, 14th floor
San Francisco, CA 94103
Tel. (415) 227-4100 Fax. (415) 227-4116

11.     In this discussion, Mr. Justyn offered to introduce me to Shawn Evans, the owner of DC Risk Solutions, Inc. ("DC Risk"). Mr. Justyn told me that Mr. Evans lived in France and ran his business out of France but had client relationships in Northern California. Mr. Justyn also told me that Mr. Evans did not have a license to sell insurance in California. Mr. Justyn suggested that working for Mr. Evans might be a good fit for me, as Mr. Justyn and I could continue to work together on our mutual clients were I employed at DC Risk. Mr. Justyn further stated to me that if the Health Care Team moved to another brokerage, that he would try again to have us work together. Significantly, Mr. Justyn also told me that DC Risk did not have any employee benefit clients, only clients securing medical malpractice coverage.

12.     Shortly thereafter, I met with Mr. Evans to discuss the possibility of my employment with DC Risk. When I first spoke with Mr. Evans, I assumed that he had spoken with Mr. Justyn about me because he told me he was expecting my call. During our initial meeting, Mr. Evans specifically told me that I could "house" _my_ existing business and _my_ existing clients with DC Risk using their infrastructure to support them. He also stated that we could work together on new clients. He went further to state that, if I decided to go back and work with Mr. Justyn at a later date, he would understand and support my decision.

13.     Based upon my discussions with Mr. Evans and the representations he made, I accepted employment and started working for DC Risk in approximately June 2005.

14.     From the inception of my DC Risk employment, as was the case with all DC Risk employees, I worked from my home. The company "office" at One Embarcadero Center, Suite 500, in San Francisco is a an office that serves only as a mail drop and at which multiple users can essentially rent offices and conference rooms for temporary use. In the case of DC Risk, no one in the company worked there, including Shawn Evans who worked, as did I, from home.

15.     Because there was no central office, through the date of my resignation, there was no accommodation for employees to send their hard copy files to a designated location. Employees were told to either shred paper or keep the files in our homes. At different times when I met with Judith Evans at her and Shawn Evans' home, I would bring some of the hard files.

16. When I began working for DC Risk, Mr. Evans confirmed what Mr. Justyn had earlier told me, namely that DC Risk had no Employee Benefit insurance business nor did DC Risk have anyone that was licensed to offer Employee Benefit insurance. Thus, the only employee benefits insurance business was that which I was bringing to the company.

17. Also, when I began working with DC Risk, it was not licensed to sell insurance in California. I filled out license applications and obtained the California license to sell insurance. I actually paid the application fees which Mr. Evans later reimbursed.

18. During my employ with DC Risk, I continued to work with Mr. Justyn, sharing clients and other potential business opportunities. I regularly discussed my working relationship with Mr. Justyn with Mr. Evans, informing him of our mutual marketing and business efforts. Mr. Evans always supported these efforts. He appeared excited at the prospect of these potential shared business opportunities and told me on a number of occasions that he supported me jointly working with Mr. Justyn.

19. In the end of 2005, I learned that Mr. Justyn had moved from USI to Lawson Hawks.

20. During the time Mr. Justyn worked with Lawson Hawks, I continued to work with Mr. Justyn, sharing clients and business opportunities in exactly the same way I had when he worked for USI. Also, during the time Mr. Justyn worked with Lawson Hawks, I continued to regularly provide updates to Mr. Evans as to Mr. Justyn and my mutual marketing and business efforts. Just as before, Mr. Evans supported these efforts.

21. Through our mutual efforts, in June 2006 Mr. Justyn introduced me to Eskaton, a large senior living and services company. Mr. Justyn was on the board of directors of this company. Mr. Justyn told me that as a board member, he was asked to recommend two brokers to make proposals on employee benefit insurance. He recommended Lawson Hawks and me.

22. After both Lawson Hawks and I made presentations on our proposal, Eskaton choose to procure their employee benefit insurance through me and DC Risk.

23. In late 2006, I began to realize that DC Risk did not have the resources to service my large clients and as a result I requested additional help. At that time, in addition to my primary

focus on developing new business, I was also tasked with ministerial functions, including arranging for actuarial review service, responding to HIPPA questions to ensure HIPPA compliance, responding to COBRA issues and questions, developing and producing employee communications strategy, and analyzing claim data. The burden of these day-to-day account manager functions left me insufficient time to develop new and different business.

24. At some point in 2007, I learned that DC Risk had begun negotiations to purchase Mr. Justyn's business from Lawson-Hawks. Understandably, I was excited at the prospect of again working with Mr. Justyn. Later, I learned that a dispute had arisen between Lawson Hawks and DC Risk in connection with the prospective acquisition as a result of which Mr. Justyn would remain at Lawson-Hawks.

25. Toward the end of 2007, I became concerned about my compensation at DC Risk and expressed my concerns to Mr. Evans both orally and in writing. These disagreements continued into 2008. The tone and tenor of emails from Mr. Evans became more and more hostile such that I felt I was in a hostile work environment. Because of the hostile work environment, lack of support, and other things, I decided to leave DC Risk for another position.

26. Shortly after Mr. Justyn began working for Lawson Hawks, he contacted me and stated that he believed Lawson Hawks would be enthusiastic to have me work for them in their employee benefit department. Thus, when I concluded that I no longer wished to stay in DC Risk's employ, I contacted Mr. Justyn about joining Lawson Hawks. Lawson Hawks eventually gave me an offer of employment which I accepted, tendering my resignation to DC RISK on February 18, 2008.

27. Actually, my last day on the DC Risk payroll was Friday, February 15, 2008. February 18, 2008 was a national holiday (Presidents' Day). It was up to the individual employee if they needed to work that day based of deadlines for work projects that week and DC Risk expected me to be available if calls or emails came in from colleagues and/or clients. Technically, anything I did that day was on a holiday.

28. Thirty days before I tendered my resignation, I delivered DC Risks files to Mr. Evans so that they could be archived. On the day following my resignation, I Federal Expressed my

laptop, printer, telephone, credit card, computer accessories, and other miscellaneous equipment to Mr. Evans. At that time, I believed that this shipment contained all DC Risk property and files. However, after receiving a letter from DC Risk two days later requesting, amongst other things, that all files be returned, I checked some boxes in my garage and found some old DC Risk files mixed in with my personal files. I put these files in a box for shipment and I did not look at them. To my recollection, the last time I looked at any of these documents – all from inactive files - was more than a year ago. I Federal Expressed these files to DC Risk on February 23, 2008.

## RESPONSE TO DC RISK CLAIMS

### 1. Alleged Solicitation of DC Risk Clients

29. DC RISK's claim that I used DC Risk information to solicit clients "while still employed by DC Risk." I used no DC Risk information to announce my change of employment and only wrote to my clients to advise them of my move. I did not include any DC Risk information in my correspondence. I did not execute the letters or deliver them for transmission to the clients until after I had tendered my resignation and packed for shipment DC Risk property, including the laptop DC Risk had provided me. The letters were not prepared on DC RISK's laptop nor on stationary provided me by DC Risk.

30. Information regarding the three clients of whom DC Risk complains follows.

### a) Eskaton

31. Eskaton was a Wes Justyn client and became one of our joint clients while I was employed at DC Risk as a result of a recommendation from Wes Justyn who was on its board of directors. It was a client I considered among those Shawn Evans had told me I could "house" at DC risk for as long as I stayed employed there and could take with me upon my departure. When I left DC Risk, I joined Mr. Justyn at Lawson Hawks. I understand that the business followed me based on Mr. Justyn's input and the company's satisfaction with the services I had performed for it.

32. On February 19, 2008, having earlier transmitted a letter announcing my move to Eskaton, I called Terrie Beck, the Director of Compensation and benefits with Eskaton. I confirmed that she had received my letter. Ms. Beck expressed concern that she would not be

14357

- 6 -

DECLARATION OF NANCY FROST IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR TRO AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION    CASE NO.: C 08-02948 SI

working with me any longer given my change of employment. I told Ms. Beck to speak with Todd Murch, the CEO of Eskaton as he may have had a conversation with Mr. Justyn. While I fully expected Eskaton would decide to move its business to the brokerage for whom Wes Justyn then worked and I would be working, I said nothing more than suggest she speak to Todd Murch and did not solicit the business in the conversation with Ms. Beck.

33. Later that day, Ms. Beck called and informed me that Mr. Murch had directed her to move the employee benefit insurance to Lawson Hawks. Ms. Beck told me that Mr. Murch instructed her to work with me on preparing the appropriate paperwork.

34. I have not conveyed to Lawson Hawks any confidential information regarding the relationship between Eskaton and DC Risk during my past employment by DC Risk.

### b) Palo Verde Hospital

35. As is the case with Eskaton, Palo Verde Hospital was a long time client of Wes Justyn and my relationship with Palo Verde Hospital resulted from an introduction through Mr. Justyn. I considered Palo Verde Hospital (as I did Eskaton) among the clients "housed" with DC Risk pursuant to my earliest discussions with Mr. Evans in which he acknowledged my relationship with Mr. Justyn and assured me that he would support our business relationship and acknowledge my interest in rejoining Mr. Justyn if the opportunity presented itself. I did not contact Palo Verde Hospital after I had sent my letter announcing my change of employment. I recollect that I was contacted by an administrative assistant who requested that I forward change of broker letters.

36. I have not conveyed to Lawson Hawks any confidential information respecting DC Risk's relationship with Palo Verde Hospital.

### c) Sutter Coast Hospital

37. I do not know how long DC Risk worked with Sutter Coast Hospital prior to my introduction to that company in June 2006. Upon my first visit with Sutter Coast Hospital at a meeting attended by Shawn Evans in order to introduce me to the hospital and its Human Resource Director, Linda Ivetan, she announced that the hospital was considering moving its insurance business from DC Risk due to the poor level of customer service it had been receiving from DC

Risk. I personally succeeded in rehabilitating that relationship within the next three months and secured a renewal of the business on January 1, 2007. I became the managing broker and main contact for Sutter Coast Hospital.

38. When I resigned from DC Risk, I Federal Expressed a letter to Jim Strong at Sutter Coast Hospital announcing that I was leaving DC Risk to work for Lawson Hawks. On February 19, 2008, Mr. Strong emailed me saying he had the letter. Shortly thereafter, he telephoned me and told me that he wanted to continue to work with me at Lawson Hawks. He asked me the proper way to do this, as he wanted to do this "the right way." I let him know that a change in brokers was effected by signing a change of broker letter.

39. Apart from sending the letter to Sutter Coast Hospital, I did not initiate any contact with it and only responded to Mr. Strong upon his contacting me. I have not conveyed to Lawson Hawks any confidential information regarding the relationship between the hospital and DC Risk.

### 2. Alleged Wrongful Deletion From Laptop

40. During my employment with DC Risk, I routinely and regularly deleted unnecessary corporate information, including emails. As is the normal corporate practice at DC Risk and elsewhere, the data on my computer was backed up by corporate support on a regular basis. Whatever existed on my computer was maintained and available for inspection either on DC Risk's intranet or through the computer back-up system.

41. Additionally, I was explicitly permitted to maintain personal data on the computer and Mr. Evans and others at DC Risk were well aware and approved of that storage. I fully understood that, if I left the company, I could download or delete all the personal information I had place in the computer. I did so. I did not delete from the DC Risk laptop any information that had not already been downloaded and provided in hardcopy or forwarded on by e-mail. I provided corporate information to either Sue Sample or Judith Evans for posting on the intranet site or maintain as hard copies. I also passed on hard copies to Judith Evans at the time when we would meet weekly which was generally Monday mornings. I never intentionally deleted any company information that I felt

needed to be kept by DC Risk without first passing it on to support staff either through email or hard copy.

42. I have absolutely no recollection of deleting a Sutter Health Partners' Wellness proposal for Eskaton from my system. Moreover, I am confident that other DC Risk personnel, such as Shawn Evans and/or Beverly Thomas who also attended the meeting where the proposal was solicited, were either copied on the proposal or had access to the proposal.

43. Beverly Thomas contends, in paragraph 4 of her declaration that, when she received the return of my laptop, all emails except those among DC Risk personnel had been deleted and that client folders were empty, presumably because I had deleted all our exchanged email correspondence. In my belief, that assertion has no factual basis.

44. While working for DC Risk, any emails that needed to be saved were either forwarded or carbon copied to either Judith Evans and/or Sue Sample. Mr. Evans and Judith Evans told me that I was to do this. They told me that they keep and post all such communications on the company intranet. The DC Risk company intranet is a web-based program/resource for all employees to archive client and company information. Thus, each time I forwarded or carbon copied them on each such email, I would delete it from my computer as I knew that DC Risk had an archived copy. Also, during my employment at DC Risk, I met with Judith Evans every Monday to give documents to her that were not emailed to her or Ms. Sample. Once these documents were given to her, I would routinely delete them from my computer. If there were written documents, I would shred them per company policy. (See paragraph 15 *supra*.)

45. On a quarterly basis, Ms. Sample would come to my home to service my company laptop. She would back up the data on the computer, copying email and other documents. Each time, she would hook a UBS hard drive and copy important data to it. I understood and believed that she then took the data and the hard drive and loaded important information onto the company computer system, including the company intranet.

46. On one particular occasion in either November or December 2007, Ms. Sample came to my home to service my computer. After copying data, she discussed alternative ways for me to

be more efficient and organized with data on my computer. She suggested creating folders for each current and prospective client in my email program. In fact, she set up each such folder on my laptop. However, I never used these folders. They were empty when there were created and remained empty until the day I turned in my laptop to DC Risk. I categorically deny that I undertook to delete client information from my laptop or that I emptied client folders. As I recall, there may have been a couple old folders that may have contained old emails. If, however, they were important, I am convinced that they would have been downloaded or forward through the process discussed above long before the date of my resignation.

### 3. Alleged Diversion of Company Property

47. Prescription Solutions was scheduled to provide Eskaton the "loss history" for Eskaton's pharmacy benefits on February 15, 2008. This "loss history" is needed to evaluate the future premium costs for pharmacy coverage and I had earlier discussed with my contact at Eskaton the need to secure and forward this information to Eskaton as soon as it arrived. I did so in my function as account manager. Specifically, I provided my contact at Eskaton the information that the current "loss history" reports were available on Prescription Solutions' website and advised my contact on how to access the reports. It is my belief that the information I imparted to Eskaton from Prescription Solutions was neither proprietary nor confidential DC Risk information. No one in the insurance business considers "loss history" the confidential information of an insurance broker. Rather, the information belongs to the insured and the company that generates the "loss history" from its records. Once that "loss history" is provided to the insured, he is free to disseminate it and to solicit insurance bids based upon it from whomsoever he chooses. In providing the information, I was acting for the benefit of the client, Eskaton, and not for myself or Lawson Hawks.

### Response To Miscellaneous Statements In Shawn Evans Declaration

48. In his declaration at paragraph 5, Mr. Evans contends that, in connection with my responsibility for the management of the Employee Benefit division, both Sue Sample and Judith Evans reported to me. That statement is inaccurate. Prior to Beverly Thomas becoming Chief

Operating Officer in November 2007, Sue Sample and Judith Evans reported to Shawn Evans. Thereafter, they reported to Beverly Thomas.

49. In the same paragraph, Mr. Evans states that I "had authority to negotiate contracts on behalf of and contractually bind DC Risk without receiving prior approval", and, as an example of that alleged authority, points to "DC Risk's workers compensation coverage" the application for which I signed on behalf of DC Risk. I did not negotiate the workers' compensation coverage and only signed the application at Mr. Evan's express request because Mr. Evans was living in France at the time and WC coverage was required by California law.

50. As a further example of my supposed authority, in paragraph 5, Mr. Evans references a consulting agreement I negotiated and signed with Grays Harbor Community Hospital. Significantly, Grays Harbor Community Hospital was a client of Mr. Justyn's and DC Risk's opportunity to secure this contract was a direct result of Mr. Justyn's relationship with me. While I did negotiate and execute the one-time consulting agreement, I did so only because DC Risk had no one but me with Employee Benefit expertise.

51. Mr. Evans also claims in paragraph 5 that I negotiated and executed contracts "with vendors for DC Risk clients." My role in signing carrier appointments – as the only licensed agent at DC Risk at the time - permitted DC Risk to place business with benefit carriers. The contention that I "negotiated" these contracts is incorrect. There is nothing to "negotiate" in carrier appointments or commissions. Carrier appointments and commissions are standard for all insurance agencies. Moreover, to request a higher commission then the carrier's standard schedule would position the broker as uncompetitive when competing for business. If DC Risk negotiated over-rides with any of its preferred carrier partners, that was confidential and the sole responsibility of Shawn Evans and I was not privy to any such arrangement.

52. The argument that DC Risk appears to make as set forth in paragraphs 6, 12, and 18 of the Evans declaration regarding the proprietary nature of the Sutter Health Wellness program and proposal that was to be promoted to Eskaton is very misleading. Everyone in the Employee Benefits insurance business is aware of Sutter Health Partners and its wellness programs, and its

programs and those of numerous other companies offering wellness services to potentially decrease premium costs by improving company health experience are readily available by simply "googling" the company name or even the generic term "wellness programs." I have always felt that when companies are self-insured for their healthcare benefits that they need to adopt a wellness program to impact the health of the population which will help to manage their risk. I promoted wellness programs with other clients long before I commenced employment with DC Risk. The biggest barrier in a corporation embracing wellness is proof of return on investment. There is nothing proprietary that DC Risk developed in wellness programs. Instead, it is a matter of bringing vendors to clients so that the clients are aware of what is available in the way of wellness. I personally feel Sutter Health Partners is an excellent organization and perfect for developing a wellness program for employers, but due to the cost, it is a hard sell. While most employers of large size are generally willing to listen to a presentation, few ultimately sign up for it as the cost of wellness programs, when measured against the potential premium savings, is seldom attractive.

53. Addressing paragraph 9 and the contention that I had ready access to DC Risk's confidential and trade secret information, I would point out that every DC Risk employee and even contract employees had/have access to DC Risk's intranet site upon which information on clients is posted. Personally, I only accessed information on my clients when necessary. I have not downloaded, copied, or used after February 18, 2008 information regarding any of DC Risk's clients, the product line that DC risk provided to clients, the loss history of DC Risk clients, quotes that DC Risk obtained from carriers with respect to particular clients, commissions charged DC Risk clients, renewal dates, contact information (except that for the clients who came to DC RISK as a result of my personal efforts and/or upon referral from Mr. Justyn), or services that DC Risk intends to offer clients.

**Response To Miscellaneous Statements In Beverly Thomas Declaration**

54. Addressing paragraphs 7 and 8 of Ms. Thomas' declaration, as discussed in paragraph 45, I have dealt with wellness programs for some twenty years and am thoroughly familiar with how those programs are priced and promoted. Specifically, the pricing for such programs is not

proprietary in nature and Sutter Health Partners did not offer a "special" price to DC Risk to promote its services to Eskaton or any other client. As both Shawn Evans and Beverly Thomas attended the meeting with me on January 4, 2008, either was free to track down the pricing which apparently Ms. Thomas in fact did. As to the claim in paragraph 8 that "DC Risk was scheduled to discuss the proposal with Eskaton on February 29, 2008," the implication is misleading. The February 29th meeting with Eskaton was a quarterly meeting that I coordinated for Eskaton, in which TPA HealthComp Administrators and I participated and at which time we discussed the performance of the healthcare program and issues and preparation of changes at next policy renewal. The wellness program was not an agenda item for this meeting, although presumably it could have been discussed if the press of time did not dictate otherwise.

55. Because, as noted, TPA HealthComp Administrators was a participant in the quarterly Eskaton meetings, I forwarded an agenda to Sharon Browning, its account manager, on February 11, 2008 and asked if she "would like to make any changes/additions." (See Exhibit F to Thomas Declaration.) I did not, as Ms. Thomas contends in paragraph 10, ask Ms. Browning about information I "would need for the Eskaton meeting." I have no recollection of deleting my email to Ms. Browning, although it is so insubstantial, I would have no particularly reason for keeping it.

56. In paragraph 14, Ms. Thomas refers to a private email from my personal email account. In an email from Mr. Hilgers on February 6, 2008 in which he tendered an offer of employment he wrote: "I assume you are doing housework consistent with our conversation yesterday." The day before, I had a conversation with Mr. Hilgers where I did tell him I was behind in my housework. What I meant was that I had to cleanup my home. I understood Mr. Hilgers' comment as a humorous reference to housecleaning. Moreover, I did not consent to DC Risk accessing my personal account and, if it did so, I consider it a violation of my privacy rights.

57. In paragraph 16, Ms. Thomas argues that I had access to a "captive" insurance consulting report DC Risk secured from a consulting company respecting Eskaton. DC Risk's "captive" insurance promotion is in the area of medical malpractice insurance coverage and in no way involves employee benefit coverage or risk. I had access to that information, as did all DC

Risk employees, through DC Risk's corporate intranet site. However, since I had so little support within my area of expertise in employee benefit coverage, I had no interest or time to review other producer's client information in an unrelated area of insurance. I did not review the Eskaton consultant's analysis nor did I copy, download or forward it to anyone.

58. In conclusion, I have not retained nor in any way used confidential, proprietary, or trade secret information I may have learned during the course of my employment with DC Risk, and I have not "solicited" business from any DC Risk clients. Three clients I serviced while at DC Risk have elected to move their accounts to Lawson Hawks, two of which, as noted above, were Wes Justyn clients referred to me by him, and the third that chose to follow me to Lawson Hawks did so, according to Mr. strong, because on its conclusion that my services merited the change. At no time have I ever told or otherwise communicated to anyone at Lawson Hawks information about commission rates, loss runs, loss history, etc. I did not personally keep this information either on my computer or in written files, as DC Risk had this information either in its intranet or computer system.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on July 9, 2008 at Mountain View, California.

_____
NANCY FROST

- 14 -

14357

DECLARATION OF NANCY FROST IN OPPOSITION TO PLAINTIFF'S APPLICATION FOR TRO AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION    CASE NO.: C 08-02948 SI